# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

C.F.B., a minor, by and through her next friend
TERRI E. BAKER,

      **Plaintiff,**

      **v.**

**THE BOARD OF COMMISSIONERS OF
JOHNSON COUNTY, KANSAS, et al.,**

      **Defendants.**

**Case No. 16-2645-CM**

## MEMORANDUM & ORDER

Plaintiff C.F.B., a minor, by and through her grandmother and next friend, Terri E. Baker, brings this action against the Board of Commissioners of Johnson County, Kansas ("BOCC"), Sheriff Frank Denning, Lieutenant Thomas Reddin, Sergeant Christopher Mills, and Deputy Travis Turner. Plaintiff claims that defendants deprived her of her civil rights under 42 U.S.C. § 1983 when representatives from the Johnson County Sheriff's department illegally seized her from her grandfather's driveway. The matter is now before the court on defendants' Motion for Summary Judgment (Doc. 10) and plaintiff's Motion to Permit Discovery Under Rule 56(d) (Doc. 23). Plaintiff responded to defendants' summary judgment motion and subsequently filed her motion for discovery asking the court to stay or deny the summary judgment motion so that she could more fully develop the record in order to respond to defendants' arguments. Defendants responded, arguing that no additional evidence beyond what was already provided is necessary to fully resolve the question of qualified immunity. The court agrees that no additional evidence is required to resolve the qualified immunity issue and, for the reasons set forth below, denies defendants' motion for summary judgment in part and grants it in part.

## I.     Factual Background

On September 2, 2015, Deputy Travis Turner of the Johnson County Sheriff's Department, was dispatched to meet with Ryan McCormick and his mother in a Johnson County parking lot.  Upon arrival, Ryan informed Deputy Turner that he had filed for and been granted a Temporary Order of Protection from Abuse (PFA) against his estranged wife, Maggie McCormick.  Ryan filed the petition in Wyandotte County and, after a hearing, a Wyandotte County judge granted the PFA, which prohibited Maggie from interacting with Ryan.  According to the petition, Ryan sought the PFA for protection only for himself, claiming that while at a bar, Maggie allegedly sent someone outside to attack him and then actively prevented him from calling the police for help.  She also continued to call and harass him after the incident and attempted to break into his house.

Ryan also indicated in the petition that he and Maggie had a child in common, but did not seek protection for the child.  He requested that Maggie be prohibited from entering his residence in Kansas City, Kansas, but sought joint legal custody of the child with parenting time.  Ryan submitted a Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) affidavit along with his petition, in which he indicated that his child with Maggie, S.F.M., was born in November 2014 and was currently residing with Maggie at a residence in Stilwell, Kansas.  While the affidavit did list the birth month and year for the child, it did not state the child's gender or age.

The PFA was granted on September 1, 2015.  The order protected only Ryan and did not include any protection for S.F.M.  The order, however, noted that "[t]emporary legal custody and residency of the following named minor child(ren): S.F.M. II, shall be: sole legal custody granted to Plaintiff . . . until this order expires."  (Doc. 16-1, at 14.)  Within the text of the order, the judge had the option to grant temporary parenting time to defendant or to withhold parenting time from the defendant.  The judge did not choose either of these options.  The order indicated it was effective when

signed by the judge and that "[l]aw enforcement officials shall immediately enforce this order." (Doc. 16-1, at 15.)

Ryan provided the petition and order to Deputy Turner upon arrival at the scene. He informed Deputy Turner that the PFA had not yet been served on Maggie and that the Wyandotte County judge instructed him to directly contact the Johnson County Sheriff's office for processing and service, as it would be faster than if the court were to contact deputies for service. Deputy Turner immediately expressed concern over whether the Johnson County Sheriff's Department had authority to serve an order from Wyandotte County. Ryan also explained he was unclear about the custody order as he had only requested joint custody. Deputy Turner told Ryan and his mother that he needed to confirm his authority to serve the order and take custody of the child. Deputy Turner began making phone calls seeking guidance regarding the order and the custody issue.

Because the entire encounter was recorded on Deputy Turner's body camera, the court notes the conversation between Deputy Turner, Ryan, and Ryan's mother immediately following his phone call:

> Deputy Turner: "Well, the only thing I'm trying to figure out for 100% sure is usually we don't . . . force somebody if they, like, if they don't want to give the kid back, we don't forcibly take 'em. But, we're just trying to make 100% sure because these things get messy."
>
> Ryan's mother: "So if she won't give the child up, um, what do we do, go back to the judge because, and say she wouldn't do it, and then what do they arrest her or what?
>
> Deputy Turner: "They may—"
>
> Ryan's Mother: "Because basically she's denying a court order saying that he has – yeah – she'd be in contempt of court for not following what that says."

(Ex. B at 4:00-4:45)  At this point, Deputy Turner received another phone call and then informed Ryan and his mother that someone would be calling the civil unit in the Sheriff's Department for guidance. (*Id.* at 5:54).  Deputy Turner then discussed the child custody order in the PFA:

> Just because [child custody exchanges] can become really involved . . . yeah . . . you know because if something happened to the kid, she's gonna say well they forcefully took my kids away . . . then it puts us in a world of crap.

(*Id.* at 6:10).  Ryan's mother then told Deputy Turner that if Maggie "absolutely refuses" to hand over the child, that she and Ryan will just call the judge.  Ryan agreed with his mother and noted that he had requested joint custody because "she has never done anything to the child."  (*Id.* at 6:30-6:44).  Ryan also noted that he didn't know, based on the order, if he had to take the child at this point.  (*Id.* at 6:46). Ryan's mother then stated:

> Yeah, and we're not the type that, you know, if we don't want . . . we're not wrenching the child out of her hand.  We're not going to cause him any kind of . . . if she's refusing to do it, then we'll just take notes, maybe, obviously . . . you know, get your, you'll have your thing, and then we'll be telling the judge "well this is the officer here and they refused to give the child," so I guess she'd just have to be in trouble legally with that then, if she refuses.

(*Id.* at 7:00).  Deputy Turner then took another call, allegedly from the department's civil sergeant, and then informed Ryan and his mother of his plan regarding the situation:

> But basically, you know, with all this I'm going to tell her, you know, basically if she don't give the kid she's going to go to jail, so that's basically.  And, that's what I figured, but I just wanted to make 100% sure before I go in there and start making myself look like a fool.

(*Id.* at 20:50).  At that point, Ryan and his mother followed Deputy Turner to the home of Linus and Terri Baker, who are the parents of Maggie and grandparents of plaintiff.  The Bakers' residence was listed on the PFA petition as the address at which Maggie could be served.  Deputy Turner arrived on scene and proceeded up the driveway, where he made contact with Linus Baker ("Baker").  Plaintiff,

-4-

who was approximately two years old at the time, appeared in the driveway with Baker. Deputy Turner told Baker, "we're here to talk to Maggie," to which Baker responded "you're going to have to leave." (Ex. C at 1:02-1:06). Lt. Thomas Redding and Sgt. Christopher Mills of the Johnson County Sheriff's Department also arrived at the residence to assist Deputy Turner. After Baker asked the officers to leave, Sgt. Mills responded, "we're not doing that, I've got a court order, we're here to take [S.F.M.] . . . I've got a court order, she's going with us." (*Id.* at 0:55).

Baker continued to demand that the officers leave, and Sgt. Mills insisted that he had "a protection from abuse order granting sole custody to the plaintiff." (*Id.* at 1:08.) Baker began to retreat up the driveway and Sgt. Mills followed him and approached plaintiff, who was standing nearby. Sgt. Mills asked plaintiff, "are you [S.F.M.]? Come here sweetheart." (*Id.* at 1:16.) As Sgt. Mills reached down to pick up plaintiff, Baker began yelling "that is not [S.F.M.]!" (*Id.* at 1:19.) Plaintiff began to cry and scream for her mother as soon as Sgt. Mills picked her up. Baker continued to yell at Sgt. Mills to "give me that baby, give me [C.F.B.]." (*Id.* at 1:24.) Sgt. Mills proceeded to carry plaintiff down the driveway noting he was going to "check with the parents" presumably about the identity of the child. (*Id.* at 1:33.) Sgt. Mills carried plaintiff off the driveway and took her to the van where Ryan was parked with his mother. Sgt. Mills asked Ryan if plaintiff was S.F.M. to which Ryan responded "no, [S.F.M.] is a boy." (*Id.* at 1:44.)

Sgt. Mills then carried plaintiff back up the driveway. Baker grabbed plaintiff out of his arms and carried her up the driveway, continuing to demand that the officers get off his property. As Baker took plaintiff into the house, one officer is heard asking "did the order say for us to get the kid?" (*Id.* at 2:23.) As Deputy Turner began looking through the PFA order, Sgt Mills suggested they should "call Deer," and noted "I wish they would have handled it." (Ex. C, at 2:39.) Sgt. Mills proceeded to get "Deer" on the phone and asked "hey, how much authority do we have? He's telling us to get off

the property, and we can't take the child. All this stuff. He's an attorney. How enforceable is this order?" (Ex. D, at 3:18.)

The officers eventually left the driveway in order to update Ryan and his mother who were still in their van parked on the street. After a few minutes, Ryan and his mother drove away and the incident was over. Officers were unable to confirm whether Maggie or S.F.M. were at the residence, and were unable to serve her with the PFA at that time.

## II.    Legal Standards

### a.    Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party demonstrates an absence of evidence in support of an element of the case, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The nonmoving party "may not rest upon the mere allegations or denials of his pleading." *Id.*

In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 252.

### b.  Qualified Immunity

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  This protection applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Callahan*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  The purpose behind qualified immunity is to ensure that "insubstantial claims against government officials [are] resolved prior to discovery." *Callahan*, 555 U.S. at 231.

When a defendant has moved for summary judgment based on qualified immunity, the court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  A defendant is entitled to qualified immunity unless the plaintiff can show "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.*  If a plaintiff successfully overcomes the two-part analysis, the burden shifts to the defendant "as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Booker*, 745 F.3d at 412.

### III.  Analysis

Plaintiff brings three claims against defendants, all under 42 U.S.C. § 1983—(1) unlawful arrest for the seizure of her person under the Fourth Amendment, (2) excessive force under the Fourth Amendment, and  (3) municipal liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.C.*, 436

U.S. 658 (1978), for policies and customs violative of civil rights. Defendants allege they are entitled to qualified immunity for the Fourth Amendment claims. They further argue plaintiff has failed to state a claim for relief for the *Monell* claim.

### a. Fourth Amendment Claims

#### i. Constitutional Violations

Plaintiff argues defendants violated her Fourth Amendment rights both when they illegally seized her and by using excessive force during the seizure. Defendants have moved for summary judgment on counts one and two, arguing they are entitled to qualified immunity.

As mentioned above, in order to overcome defendants' assertion of qualified immunity, plaintiff must show that a reasonable juror could find defendants both violated her constitutional rights and that these rights were clearly established at the time of defendants' conduct.

Defendants first address plaintiff's claim that her Fourth Amendment rights were violated when she was illegally seized from her grandfather's driveway. In conducting the qualified immunity analysis, the court must "first consider whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). Because the case is at the summary judgment stage, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007). In qualified immunity cases, this often means adopting the plaintiff's version of facts, so long as that version is not "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380.

Plaintiff's version of the facts is largely undisputed. Body camera evidence provides a reliable account of the incident and supports plaintiff's assertions of fact. Thus the court must decide based on

the evidence in the record whether a reasonable jury could conclude plaintiff's Fourth Amendment rights were violated.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. The purpose of the Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Court of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967). A seizure, as defined by the Fourth Amendment, occurs when "a reasonable person would believe that he or she is not 'free to leave.'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). "Because the Amendment focuses on safeguarding persons from unwarranted intrusion, and not on regulating the behavior of particular governmental actors, the prohibition against unreasonable seizures extends to civil, as well as criminal, investigations by the government." *Jones v. Hunt*, 410 F. 3d 1221, 1225 (10th Cir. 2005).

A seizure, however, is only illegal under the Fourth Amendment if it is unreasonable. To be reasonable, a seizure—with limited exceptions—requires either a warrant or probable cause. *Id.* (citing *Camara*, 387 U.S. at 528–29). In recognizing the many "factual determinations that must regularly be made by agents of the government," the Supreme Court has held that the reasonableness requirement of the Fourth Amendment allows room for reasonable mistakes. *Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990) (noting mistakes "must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

The Tenth Circuit has found that a government agent's removal of a child from their home constitutes a seizure under the Fourth Amendment. *See Burgess v. Houseman*, 268 F. App'x 780, 783 (10th Cir. 2008) (finding an unreasonable seizure when a social worker helped seize and detain a child without a warrant or probable cause to believe the child would be abused if she remained in her mother's custody); *Roska*, 328 F.3d at 1244 (finding child was unreasonably seized within meaning of the Fourth Amendment when state actors removed him from his home under belief that his health was at risk.).

Defendants argue they are entitled to qualified immunity because there was no violation of plaintiff's Fourth Amendment rights under the first prong of the qualified immunity analysis. Defendants claim they made a reasonable mistake of fact as to the identity of plaintiff, which made the seizure reasonable under the law. Defendants state that the PFA order did not indicate the gender of the child at issue and at no time did Ryan or his mother mention another child might be present at the residence. Defendants also argue that Sgt. Mills made a reasonable mistake of fact when he misidentified plaintiff based on evidence from the body-cam video which, defendants allege, shows plaintiff nodding affirmatively and raising her arms when Sgt. Mills asks if she is S.F.M.

The court is unpersuaded by defendants' arguments. Based on the evidence provided in the record, the court determines that a jury could find that defendants' actions were not reasonable under the circumstances. First and foremost, plaintiff was seized as defined by the Fourth Amendment. Sgt. Mills lifted her off the ground and carried her off the driveway without a warrant or exigent circumstances justifying the seizure. Even after her grandfather told Sgt. Mills that she was not S.F.M., Sgt. Mills continued to carry plaintiff down the driveway noting he was going to "check with the parents." At that point, plaintiff was not free to leave until Sgt. Mills had confirmed her identity.

The seizure, however, may still be lawful if defendants made a reasonable mistake of fact as to the child's identity. In instances, for example, where officers arrest the wrong person pursuant to a valid warrant, the court must evaluate the totality of the circumstances to determine whether the mistake was reasonable. *See Hill v. California*, 401 U.S. 797, 802–804 (finding that "when [police] reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest" only when the circumstances surrounding the mistaken arrest justify the mistake); *Rodriguez v. Farrell*, 280 F.3d 1341, 1347 (11th Cir. 2002). In *Farrell*, the Eleventh Circuit considered, as part of its reasonableness analysis in a mistaken arrest case, the length of time officers had before effectuating the arrest. 280 F.3d at 1348 (noting the officers had "minutes, to make their determination [of the arrestee's identity], not months or even days.").

While defendants were obviously mistaken as to the identity of the child, the court believes that, based on the evidence provided, a reasonable jury could find the mistake was unreasonable. While the PFA order did not state S.F.M.'s gender or explicitly state his age, there was plenty of time for Deputy Turner to confirm basic identification information regarding the child, as he spent approximately 20 minutes speaking to Ryan and his mother prior to the incident. The evidence is unclear if Sgt. Mills did anything to investigate or confirm the child's identity before arriving on scene and immediately seizing plaintiff. Further, there is a genuine dispute of fact as to plaintiff's reaction on the video. The court does not accept defendants' assertion that it is clear from the video plaintiff nodded affirmatively and raised her arms to be picked up by Sgt. Mills when asked if she was S.F.M.; rather, reasonable minds could differ as to her actions in the seconds before she was picked up. Additionally, Baker began yelling at Sgt. Mills that plaintiff was not S.F.M. as soon as she was picked up. Sgt. Mills, in the absence of exigent circumstances, ignored Baker and continued to carry the screaming child down the driveway.

The court finds plaintiff has met her burden on the first prong of the qualified immunity analysis and has established that a reasonable jury could find defendants violated her Fourth Amendment rights.

### ii.  Clearly Established Law

Under the second prong of qualified immunity, plaintiffs must show that the law was clearly established to put defendants on notice that their conduct was unconstitutional.  Whether defendants may be held personally liable for the alleged unlawful conduct "generally turns on the 'objective legal reasonableness' of the action [internal citation omitted] . . . assessed in light of the legal rules that were 'clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  In order for the law to be clearly established at the time of the action, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Id.* at 640.  This, however, does not mean that the very "action in question has previously been held unlawful," rather, the unlawfulness of the action must be apparent "in the light of pre-existing law." *Id.*

Qualified immunity also applies if a reasonable officer could have believed that his conduct was lawful, "in light of clearly established law and the information the . . . officers possessed." *Groh*, 540 U.S. at 566 (Kennedy, J. dissenting).  "The central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment." *Id.*  Reasonable mistakes may occur because the officer: (1) "may be unaware of existing law and how it should be applied," (2) the officer "may understand important facts . . . and assess the legality of his conduct based on that misunderstanding, or (3) "an officer may misunderstand elements of both the facts and the law." *Id.* at 566–67.

Defendants provide three justifications for qualified immunity under prong two: (1) the PFA order on its face gave them the authority to seize S.F.M. (or plaintiff, mistakenly), (2) if the PFA did not, in fact, grant them the authority to seize S.F.M., defendants made a reasonable mistake of law as to whether they had the authority to do so, and (3) if their mistake of law was unreasonable, the law is not clearly established as to put them on notice that their conduct was unconstitutional.

The court first acknowledges the parties' arguments over whether the UCCJEA requires a separate warrant in order to seize a child for child custody purposes. The court, however, declines to comment on whether the UCCJEA applies. Instead the court finds, under Kansas law, it was unreasonable for defendants to believe the PFA granted them the authority to seize the child. Further—based on the current uncontroverted record—defendants' conduct was objectively unreasonable because defendants made no attempt to serve the PFA on Maggie before seizing plaintiff, especially when there was no demonstrated risk of danger to the child.

The threshold issue in the second prong of the qualified immunity analysis is whether the law was clearly established to put defendants on notice their conduct was unconstitutional. In this case, the question is whether it was clearly established that a warrantless seizure of a child, absent exigent circumstances, violates the Fourth Amendment. The Tenth Circuit has held that it is clearly established that children enjoy Fourth Amendment protections against unreasonable seizures. *See Burgess*, 268 F. App'x at 783 ("The law was clearly established . . . that children enjoy Fourth Amendment rights to be free from seizure, including the improper removal from their home.") (quoting *J.B. v. Washington Cnty.*, 127 F.3d 919, 928–29 (10th Cir. 1997)). As mentioned above, a warrantless seizure is unreasonable under the Fourth Amendment. Exigent circumstances may justify "a warrantless seizure and detention for child protective purposes," however, "this exception is narrow, and must be jealously and carefully drawn." *Burgess*, 268 F. App'x at 783; *see also Roska*, 328 F.3d at

1242 ("Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before . . . [removing] a child from the home."). The law, therefore, was clearly established that would put defendants on notice that their act of seizing plaintiff, without a warrant or exigent circumstances, was unconstitutional.

Once a court determines a right at issue was clearly established, "it becomes defendant's burden to prove that her conduct was nonetheless objectively reasonable." *Roska*, 328 F.3d at 1251. "The objective legal reasonableness of the officer's actions is a legal question." *Id.* Defendants argue they reasonably believed the PFA gave them the authority to seize S.F.M. (or plaintiff, mistakenly). Kansas law, however, does not support this proposition. Nothing in the Kansas Protection from Abuse Act authorizes the seizure of a child pursuant to a PFA, especially when the child is not the subject of the PFA and is not in immediate danger. When a child is in immediate danger, the Kansas Code for Care of Children allows for a judge to issue an ex parte order directing authorities to take a child into custody. *See* Kan. Stat. Ann. § 38-2242(a). In any other instance when the welfare of the child is not at issue, a child custody order may be enforced as any other judgment. *See* § 12:37. Enforcement of custody, 2 Kan. Law & Prac., Family Law § 12:37. In instances where a parent refuses to comply with a custody order, that parent may be held in contempt of court or may be charged with a criminal interference with parental custody. *See id.*; Kan. Stat. Ann. § 21-5409. Under the Kansas Protection from Abuse Act, a court may find a defendant in contempt if, after a hearing, the court finds the defendant in violation of any order. *See* Kan. Stat. Ann. § 60-3110.

In the present case, the temporary PFA order, protecting only Ryan and not S.F.M., granted Ryan sole legal custody of S.F.M. until the following hearing date. Nothing in the order directed officers to forcibly remove S.F.M. from Maggie's custody. The custody order, rather, was an order within the PFA that was enforceable like any order. Further, based on the evidence presented,

defendants indicated they understood the bounds of their authority in regards to the child custody order.  Deputy Turner spoke at length with Ryan and his mother prior to the incident telling them, "[w]ell, the only thing I'm trying to figure out for 100% sure is usually we don't . . . force somebody if they, like, if they don't want to give the kid back, we don't forcibly take 'em.  But, we're just trying to make 100% sure because these things get messy."  After speaking to other officers on the phone, Deputy Turner told Ryan and his mother, "But basically, you know, with all this I'm going to tell her, you know, basically if she don't give the kid she's going to go to jail, so that's basically.  And, that's what I figured, but I just wanted to make 100% sure before I go in there and start making myself look like a fool."  Deputy Turner's statements prior to the incident indicate that he was aware that the Sheriff's Department did not have the authority to forcibly remove a child from a parent's custody and that the remedy for non-compliance with a custody order was contempt of court.  The court is unpersuaded by defendants' argument that they reasonably believed the PFA granted them authority to forcibly remove a child from her home in order to facilitate the transfer of child custody.

The court also finds defendants' conduct was objectively unreasonable because the law is clearly established that officers do not have the authority to remove a child from custody without a hearing and *notice* to the parent, unless they have an ex parte order to remove the child or the child is in imminent danger.  *See Gomes v. Wood*, 451 F. 3d 1122, 1128 (10th Cir. 2006) (finding state officials may not remove children from the home, even through a temporary seizure, without due process of law which requires that parents "receive prior notice and a hearing" unless emergency circumstances exist which pose "an immediate threat to the safety of a child.").  The Tenth Circuit, in interpreting an Oklahoma protection from abuse law, found that absent evidence of child endangerment, parents are constitutionally entitled some opportunity to comply with court orders before officers can remove their children.  *See Hollingsworth v. Hill*, 110 F.3d 733, 740 (10th Cir. 1997).

Here, the judge granted Ryan sole legal custody of S.F.M. as part of the PFA against Maggie. Defendants were dispatched to serve the PFA on Maggie. And while the PFA did authorize law enforcement officers to "immediately enforce this order" and to "provide any other assistance necessary to enforce [the] orders," the law is clearly established that a parent must first have notice of the change in custody. When defendants arrived at the Baker residence, they did not attempt to serve Maggie with the PFA, rather, they immediately sought custody of the child without first giving Maggie notice that sole custody had been granted to Ryan. Upon arrival, Sgt. Mills told Baker "we're here to take [S.F.M.] . . . I've got a court order, she's going with us." (Ex. D, at 0:55.) Defendants did not allow Maggie an opportunity to peacefully transfer custody of S.F.M. They instead saw a young child and assumed they had the authority to seize the child in order to facilitate the custody transfer, despite the absence of exigent circumstances and without confirming the child's identity.

In conclusion, the law is clearly established that a warrant is required before a child may be seized by law enforcement, absent exigent circumstances. Defendants' act of seizing a child, and in fact the wrong child, before attempting to serve the PFA on the subject of the PFA was objectively unreasonable. There was no evidence, beyond alleged threatening conduct between Ryan and Maggie, that would lead officers to believe the child at issue was in imminent danger, thus justifying an immediate seizure of the child. For these reasons, the court finds plaintiff's rights were clearly established and defendants are not entitled to qualified immunity.

The court is also unpersuaded by defendants' argument that the seizure of plaintiff was lawful under the community caretaking function exception to the Fourth Amendment warrant requirement. "A warrantless arrest may also be justified if the arresting officer was acting in a 'community caretaking' role." *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012). Defendants argue this exception applies to the warrantless seizure of plaintiff because they were acting under a belief that the

child at issue may be in danger.  As mentioned above, there is no evidence in the record to support defendants' argument.  The PFA was issued for protection only of Ryan.  Ryan had the opportunity to request a PFA for S.F.M. and declined to do so.  He also requested joint custody in the PFA petition. Video evidence shows that neither Ryan nor his mother feared S.F.M. was in danger, and expressed that they did not want to force S.F.M. from Maggie if she refused to transfer custody, rather, they would go back to the judge the following day and seek legal remedies for enforcing the custody order. There is no evidence that plaintiff or S.F.M. were in imminent danger that would justify their immediate seizure from the Baker home.  *See Roska*, 328 F.3d at 1245 (noting "the mere possibility of danger is not enough to justify a removal without appropriate process.")

For the reasons set forth above, the court denies defendant's motion for summary judgment on plaintiff's claim she was seized in violation of the Fourth Amendment.

Defendants further argue that that Lt. Reddin, and Deputy Turner neither personally participated or ordered Sgt. Mills to pick up plaintiff, and they therefore are entitled to qualified immunity as they were not personally involved in the alleged constitutional violation.

The Tenth Circuit has found it is clearly established that:

> all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official [.] In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Hall v. Burke*, 12 F. App'x 856, 861 (10th Cir. 2001). Plaintiff argues that Lt. Reddin and Deputy Turner failed to intervene and instead blocked plaintiff's grandfather, Baker, from following Sgt. Mills, despite Baker's repeated claims that plaintiff was not S.F.M.

The court is not convinced that "a reasonable jury could not possibly conclude" that Lt. Reddin and Deputy Turner had sufficient time to intercede or prevent the harm, particularly due to the limited record available at this time. For this reason, the court denies qualified immunity for all three deputies on the Fourth Amendment seizure claim.

In addition to the unreasonable seizure claim, plaintiff also alleges her Fourth Amendment rights were violated because defendants used excessive force when seizing her. "Claims that state actors used excessive force—deadly or not—in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard." *Roska*, 328 F.3d at 1243 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Objective reasonableness turns on the "facts and circumstances of each particular case," and a court must make such a determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. *See also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015) ("For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.").

Defendants argue that any force used was reasonable under the circumstances as Sgt. Mills briefly, and gently, picked up plaintiff and carried her less than 100 feet for approximately 34 seconds. Defendants claim this is reasonable considering the circumstances—that they were attempting to transfer custody pursuant to the PFA and needed to confirm the child's identity with Ryan. Plaintiff argues that any force used was unreasonable given defendants had no authority to seize her. She

suggests defendants should have used their phones to take a picture and use that picture to confirm her identity with Ryan.

Plaintiff's contention would require the court to assume that the force used in the seizure was necessarily excessive simply because the seizure itself was unreasonable. Tenth Circuit law, however, precludes this logical conclusion. In *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007), the Tenth Circuit found that an excessive force inquiry "evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Thus, if officers use a reasonable amount of force to effectuate an arrest that is unlawful under the Fourth Amendment, a plaintiff would have a claim for "unlawful arrest or detention but not an additional claim for excessive force." *Id.*

Based on the evidence in the record, the court determines that a reasonable jury could not find that defendants' conduct was excessive. While defendants lacked authority to seize plaintiff, the seizure itself was not excessive. Plaintiff's argument that defendants could have used their phone to take a photo for identity confirmation purposes is made with the benefit of hindsight, which the law prohibits the court to do.

For these reasons, the court grants qualified immunity for the defendants on the excessive force claim.

b. *Monell* Claim

Defendants argue they are entitled to summary judgment on plaintiff's claim under *Monell v. Dep't of Soc. Servs. of City of N.Y.C.*, 436 U.S. 658 (1978). First, defendants state the BOCC should be dismissed as a party because it has no involvement with the Sheriff's Department's training, supervision, policies or practices. Defendants also argue that the *Monell* claim should be dismissed because plaintiff has failed to adequately allege any facts to support her claim.

Plaintiff claims the Johnson County Sheriff's Department is liable under *Monell* based on its policies and customs which operated to deprive plaintiff of her rights. These polices include informal customs within the department, decisions of authorities with final policymaking authority, and failure to adequately train or supervise deputies.

Section 1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell*, 436 U.S. at 694 (1978). To prevail on a *Monell* claim, a plaintiff must establish a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

The Supreme Court has held that "failure to train" can be the basis for liability under § 1983, however, a plaintiff must show that the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 387–88. Therefore, § 1983 liability only attaches when the failure to train reflects "a deliberate of conscious choice by a municipality . . . ." *Id.* at 389. Deliberate indifference can be shown when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

At the outset, the court finds plaintiff has not established that the BOCC is a final policymaker in regard to the *Monell* claim. Under Kansas law, the sheriff is an independent elected official of the county. *See* Kan. Stat. Ann. § 19–801a; *Blume v. Meneley*, 283 F. Supp. 2d 1171, 1174 ("The sheriff is an independently elected officer whose office, duties, and authorities are established and delegated by the legislature. The sheriff is not a subordinate of the board of county commissioners . . . .") (quoting *Bd. of Cnty. Comm'rs of Cnty of Lincoln, Kan. v. Nielander*, 62 P.3d 247 (Kan. 2003))). "The Board

of County Commissioners has no authority to supervise, discipline, or remove the sheriff or his subordinates. . . [a]ccordingly, the conduct of the sheriff and his subordinates cannot be attributed to the county commissioners." *Lee v. Wyandotte County, Kan.*, 586 F. Supp. 236, 238–39 (D. Kan. 1984). And while the BOCC has some authority over specific Sheriff's Department functions— namely the budget and personnel actions—plaintiff has not established that the BOCC was the final policymaker in regard to any of the policies or decisions at issue in this specific case. For these reasons, the BOCC is dismissed as a defendant.

As for the remaining defendants, the court finds that summary judgment is not appropriate at this time. There is evidence in the record that indicates there was confusion as to the authority to serve civil papers and proper procedures for serving civil papers, including policies dealing with child custody situations. At this point, defendants have not established they are entitled to summary judgment as a matter of law as to whether Johnson County Sheriff's Department officials are liable under § 1983 for failure to train.

In conclusion, the court denies defendants' Motion for Summary Judgment on counts one (Unlawful Seizure) and three (Municipal Liability), but grants summary judgment on count two (Excessive Force).

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss (Doc. 10) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that defendant Board of Commissioners of Johnson County, Kansas is dismissed from the case.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Discovery (Doc. 23) is denied as moot.

Dated May 16, 2017, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**