IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

C.F.B., a minor, by and through her next friend
TERRI E. BAKER,

        **Plaintiff,**

        v.

**SHERIFF CALVIN HAYDEN, et al.,**

        **Defendants.**

Case No. 16-2645-CM

---

## MEMORANDUM & ORDER

Plaintiff C.F.B., a minor, by and through her grandmother and next friend, Terri E. Baker, brings this action against Johnson County Sheriff Calvin Hayden, Lieutenant Thomas Reddin, Sergeant Christopher Mills, and Deputy Travis Turner. Plaintiff claims that defendants deprived her of her civil rights under 42 U.S.C. § 1983 when members of the Johnson County Sheriff's Office ("JCSO") illegally seized her from her grandfather's driveway. The matter is now before the court on defendants' Motion for Summary Judgment on *Monell* Claim and Hayden Individual Capacity Claim (Doc. 96). Defendants renewed their earlier summary judgment motion, addressing only the official capacity claims against Sheriff Calvin Hayden.[1] For the reasons set forth below, the court denies defendants' motion for summary judgment in part and grants it in part.

### I. Factual Background

The facts regarding the incident remain uncontroverted even after further discovery. On September 2, 2015, Deputy Travis Turner of the JCSO, was dispatched to meet with Ryan McCormick and his mother in a Johnson County parking lot. Upon arrival, Ryan informed Deputy Turner that he

---

[1] Plaintiff concedes she no longer intends to pursue an individual capacity claim against the sheriff. At the time this case was filed, Frank Denning was sheriff of Johnson County. Any individual capacity claims against Sheriff Denning are therefore dismissed. And any individual capacity claims against the current sheriff, Calvin Hayden, are dismissed as well.

had filed for and been granted a Temporary Order of Protection from Abuse (PFA) against his estranged wife, Maggie McCormick. Ryan filed the petition in Wyandotte County and, after a hearing, a Wyandotte County judge granted the PFA, which prohibited Maggie from interacting with Ryan. According to the petition, Ryan sought the PFA for protection only for himself, claiming that while at a bar, Maggie allegedly sent someone outside to attack him and then actively prevented him from calling the police for help. She also continued to call and harass him after the incident and attempted to break into his house.

Ryan also indicated in the petition that he and Maggie had a child in common, but did not seek protection for the child. He requested that Maggie be prohibited from entering his residence in Kansas City, Kansas, but sought joint legal custody of the child with parenting time. Ryan submitted a Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) affidavit along with his petition, in which he indicated that his child with Maggie, S.F.M., was born in November 2014 and was currently residing with Maggie at a residence in Stilwell, Kansas. While the affidavit did list the birth month and year for the child, it did not state the child's gender or age.

The PFA was granted on September 1, 2015. The order protected only Ryan and did not include any protection for S.F.M. The order, however, noted that "[t]emporary legal custody and residency of the following named minor child(ren): S.F.M. II, shall be: sole legal custody granted to Plaintiff . . . until this order expires." Within the text of the order, the judge had the option to grant temporary parenting time to defendant or to withhold parenting time from the defendant. The judge did not choose either of these options. The order indicated it was effective when signed by the judge and that "[l]aw enforcement officials shall immediately enforce this order."

Ryan provided the petition and order to Deputy Turner upon arrival at the scene. He informed Deputy Turner that the PFA had not yet been served on Maggie and that the Wyandotte County judge

instructed him to directly contact the JCSO for processing and service, as it would be faster than if the court were to contact deputies for service. Deputy Turner immediately expressed concern over whether the JCSO had authority to serve an order from Wyandotte County. Ryan also explained he was unclear about the custody order as he had only requested joint custody. Deputy Turner told Ryan and his mother that he needed to confirm his authority to serve the order and take custody of the child. Deputy Turner called Sgt. Brian Deer with the Civil Division seeking guidance regarding the order and the custody issue. The Civil Division of the JCSO is responsible for carrying out court orders such as evictions, business seizures, and serving civil process from state courts. The Patrol Division of the JCSO also handles civil service, but only in unincorporated portions of the county and after hours. Deputy Turner, along with defendants Lt. Thomas Reddin and Sgt. Christopher Mills, are part of the Patrol Division.

Because the entire encounter was recorded on Deputy Turner's body camera, the court notes the conversation between Deputy Turner, Ryan, and Ryan's mother immediately following his phone call:

> Deputy Turner: "Well, the only thing I'm trying to figure out for 100% sure is usually we don't . . . force somebody if they, like, if they don't want to give the kid back, we don't forcibly take 'em. But, we're just trying to make 100% sure because these things get messy."

> Ryan's mother: "So if she won't give the child up, um, what do we do, go back to the judge because, and say she wouldn't do it, and then what do they arrest her or what?"

> Deputy Turner: "They may—"

> Ryan's Mother: "Because basically she's denying a court order saying that he has – yeah – she'd be in contempt of court for not following what that says."

At this point, Deputy Turner received another phone call and then informed Ryan and his mother that someone would be calling the Civil Division for guidance. Deputy Turner then discussed the child custody order in the PFA:

> Just because [child custody exchanges] can become really involved . . .
> yeah . . . you know because if something happened to the kid, she's gonna
> say well they forcefully took my kids away . . . then it puts us in a world
> of crap.

Ryan's mother then told Deputy Turner that if Maggie "absolutely refuses" to hand over the child, that she and Ryan will just call the judge. Ryan agreed with his mother and noted that he had requested joint custody because "she has never done anything to the child." Ryan also noted that he didn't know, based on the order, if he had to take the child at this point. Ryan's mother then stated:

> Yeah, and we're not the type that, you know, if we don't want . . . we're
> not wrenching the child out of her hand. We're not going to cause him
> any kind of . . . if she's refusing to do it, then we'll just take notes, maybe,
> obviously . . . you know, get your, you'll have your thing, and then we'll
> be telling the judge "well this is the officer here and they refused to give
> the child," so I guess she'd just have to be in trouble legally with that then,
> if she refuses.

Deputy Turner then took another call and informed Ryan and his mother of his plan regarding the situation:

> But basically, you know, with all this I'm going to tell her, you know,
> basically if she don't give the kid she's going to go to jail, so that's
> basically. And, that's what I figured, but I just wanted to make 100% sure
> before I go in there and start making myself look like a fool.

After approximately 20 minutes discussing the situation with Deputy Turner in the parking lot, Ryan and his mother followed Deputy Turner to the home of Linus and Terri Baker, who are the parents of Maggie and grandparents of plaintiff. The Bakers' residence was listed on the PFA petition as the address at which Maggie could be served. Deputy Turner arrived on scene and proceeded up the driveway, where he made contact with Linus Baker ("Baker"). Plaintiff, who was approximately two years old at the time, appeared in the driveway with Baker. Deputy Turner told Baker, "we're here to talk to Maggie," to which Baker responded "you're going to have to leave." Lt. Thomas Reddin and Sgt. Christopher Mills also arrived at the residence to assist Deputy Turner. Pursuant to JCSO policy,

anytime there is a "PFA with removal"—or when an individual needs to be removed from the residence—an additional deputy needs to be present at the scene. After Baker asked the officers to leave, Sgt. Mills responded, "we're not doing that, I've got a court order, we're here to take [S.F.M.] . . . I've got a court order, she's going with us."

Baker continued to demand that the officers leave, and Sgt. Mills insisted that he had "a protection from abuse order granting sole custody to the plaintiff." Baker began to retreat up the driveway and Sgt. Mills followed him and approached plaintiff, who was standing nearby. Sgt. Mills asked plaintiff, "are you [S.F.M.]? Come here sweetheart." As Sgt. Mills reached down to pick up plaintiff, Baker began yelling "that is not [S.F.M.]!" Plaintiff began to cry and scream for her mother as soon as Sgt. Mills picked her up. Baker continued to yell at Sgt. Mills to "give me that baby, give me [C.F.B.]." Sgt. Mills proceeded to carry plaintiff down the driveway noting he was going to "check with the parents" presumably about the identity of the child. Sgt. Mills carried plaintiff off the driveway and took her to the van where Ryan was parked with his mother. Sgt. Mills asked Ryan if plaintiff was S.F.M. to which Ryan responded "no, [S.F.M.] is a boy."

Sgt. Mills then carried plaintiff back up the driveway. Baker grabbed plaintiff out of his arms and carried her up the driveway, continuing to demand that the officers get off his property. As Baker took plaintiff into the house, the officers gathered near the garage, aware they had no authority to follow Baker inside the home. One officer is heard asking "did the order say for us to get the kid?" As Deputy Turner began looking through the PFA order, Sgt Mills suggested they should "call Deer," and noted "I wish they would have handled it." Sgt. Mills proceeded to get Sgt. Deer on the phone and asked "hey, how much authority do we have? He's telling us to get off the property, and we can't take the child. All this stuff. He's an attorney. How enforceable is this order?"

The officers eventually left the driveway in order to update Ryan and his mother who were still in their van parked on the street. After a few minutes, Ryan and his mother drove away and the incident was over. Officers were unable to confirm whether Maggie or S.F.M. were at the residence, and were unable to serve her with the PFA at that time.

After the September 2, 2015 incident, Terri Baker filed a complaint with the JCSO. The Professional Standards Unit, through Major Mike Pfannenstiel, opened an investigative file for Terri Baker's complaint. Maj. Pfannenstiel's role was to investigate the incident and make recommendations for Captain Mark Rokusek, the commander of the Patrol Division, regarding any possible violations of JCSO policies. Based on the investigation, Maj. Pfannenstiel concluded that Terri Baker's complaint was "based off of several factors which could have been handled in a more efficient manner," including the handling of the Out of County Protection from Abuse Order, a failure to thoroughly vet the PFA to determine the identity of the child at issue, lack of knowledge regarding the authority and enforcement on service of the PFA, and Sgt. Mills's act of picking up plaintiff and carrying her off the property without giving Baker a reasonable amount of time to comply with the requests of the officers. Maj. Pfannenstiel also concluded there was probable cause that Lt. Reddin and Sgt. Mills violated various procedures of the JCSO including a failure to familiarize and understand all policies and procedures, failure to supervise, and use of profane or insulting language. In response to Maj. Pfannenstiel's report, Capt. Rokusek issued Lt. Reddin and Sgt. Mills official reprimands for violating policies regarding supervision, and tasked them with preparing and facilitating a Patrol Roll Call training program specific to civil process and execution of court orders.

## II. Legal Standards

### a. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party demonstrates an absence of evidence in support of an element of the case, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The nonmoving party "may not rest upon the mere allegations or denials of his pleading." *Id.*

In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 252.

### III.    Analysis

Plaintiff brings two claims under 42 U.S.C. § 1983—(1) unlawful seizure of her person under the Fourth Amendment and (2) municipal liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.C.*, 436 U.S. 658 (1978), for policies and customs violative of civil rights. Specifically, plaintiff claims defendants Lt. Reddin, Sgt. Mills, and Deputy Turner are liable in their individual capacities for the violation of her Fourth Amendment rights. She also claims defendant Sheriff Hayden, in his official capacity as the final policymaker for the JCSO, is liable for the violation of her Fourth Amendment rights based on constitutionally inadequate customs and practices of the JCSO, informal customs of the JCSO,

decisions of final JCSO policymakers, ratification of decisions of subordinates by final JCSO policymakers, and inadequate training and supervision of JCSO deputies.

Defendants have moved for summary judgment on plaintiff's *Monell* claims. In *Monell*, the United States Supreme Court held that a municipality can be liable under § 1983 for violations of civil rights if the violation is the result of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. This "official policy" requirement distinguishes the act of the municipality from acts of the employees of the municipality, as municipality liability cannot derive from a theory of respondeat superior. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). A government, therefore, cannot be sued under § 1983 for injuries caused by its employees; rather, liability only attaches "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury." *Monell*, 436 U.S. at 694.

*Monell* liability attaches only "for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Only municipal officials who have "final policymaking authority" are subject to *Monell* liability, and the challenged action "must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy . . . ." *Id.*

To establish liability under *Monell*, a plaintiff must show "(1) the existence of a municipal custom or policy and (2) a direct casual link between the custom or policy and the violation alleged." *Hollingsworth v. Hill*, 110 F.3d 733, 742 (1997). Municipal liability can be based on (1) a formal regulation or policy statement, (2) an informal custom that amounts to a "widespread practice that, although not authorized or written by law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,'" (3) the decisions of employees with final

policymaking authority, or (4) "the ratification by such final policymakers of the decision—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citing *Praprotnik*, 485 U.S. at 123–27; *Monell*, 436 U.S. at 690–91; *Pembaur*, 475 U.S. at 480–81). Additionally, the Supreme Court has held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989) (rejecting the contention that only unconstitutional policies are actionable under § 1983). Municipal liability may be based on a failure to train or failure to supervise employees, but only if that failure results from "deliberate indifference" to the injuries that may be caused. *Brammer-Hoelter*, 602 F.3d at 1189.

Plaintiff has alleged that there is evidence under each of these categories that establishes that a policy or custom of the JCSO was the moving force behind the violation of her constitutional rights. Defendants argue that plaintiff failed to make these allegations in the Pretrial Order (Doc. 89) and instead should be limited to only arguing *Monell* liability on theories of failure to train/supervise and ratification. After reviewing the Pretrial Order, the court disagrees with defendants. Under the "Legal Claims and Defenses" section, plaintiff clearly states she seeks municipal liability based on all five theories listed above. (Doc. 89, at 7.) The court therefore will address each individually to determine whether there are genuine issues of material fact regarding the existence of a JCSO policy or custom and whether that policy caused the deprivation of plaintiff's constitutional rights.

a. *Formal, Written Policy*

Defendant Sheriff Hayden may be liable for violating plaintiff's constitutional rights if she can prove that the JCSO caused such violation through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Praprotnik*, 485 U.S. at 121 (citing *Monell*,

436 U.S. at 690). Official policy often refers to "formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur*, 475 U.S. at 480–81. Plaintiff cites five different policies or directives that existed at the time of the incident at issue that she alleges directly led to her constitutional injury.

- Civil Division Directive CV 2016-12, "Out of County Fees, Service, and Returns," issued January 1, 2016 (Plaintiff's Exhibit 20);

- Court Security Division Directive CS 2016-22, "Warrant Confirmation/Civil Process," issued July 19, 2004 and in force and effective on September 2, 2015 (Plaintiff's Exhibit 21);

- Civil Division Directive CV 2016-01, "Methods of Service & Returns," issued October 4, 2011 and revised on January 1, 2016 (Plaintiff's Exhibit 22);

- Johnson County Sheriff's Office Policy No. 2005-19, "Domestic Violence/Stalking," issued September 19, 2005 and in force and effective on September 2, 2015 (Plaintiff's Exhibit 23); and

- Patrol Division Directive Patrol: 2005-43, "Violation of a Protective Order," issued December 20, 2012, revised on November 15, 2015 (no prior version retained by JCSO as it existed on September 2, 2015) (Plaintiff's Exhibit 24).

(Doc. 105 *SEALED*, at 52.) Plaintiff claims that none of these policies discuss the requirement that government officials secure a warrant before seizing or otherwise forcing the transfer of child custody while serving PFA orders. Because these policies—which govern service of civil process and protective orders—did not include such instructions or guidance, the policies directly caused the deprivation of her Fourth Amendment rights.

Plaintiff is essentially alleging that the JCSO's failure to include certain information in their written policies, rather than an affirmative policy itself, caused her constitutional injuries. "Where the official policy that forms the basis of a local government liability claim consists of a failure to act, the plaintiff 'must demonstrate that the municipality's inaction was the result of deliberate indifference to

the rights of its inhabitants.'" *Hollingsworth*, 110 F.3d at 745; *see also*, *Canton*, 489 U.S. at 394–95 (noting that when a claim of municipality liability "is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.") (Brennan, J., concurring).  A party proves deliberate indifference by showing that the need to act is "so obvious, and the inadequacy [of existing policy or custom] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.*  Deliberate indifference requires a showing that the policymaker "'deliberately' or 'consciously' fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.*

The deliberate indifference standard is met if a plaintiff can show that the municipality has "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation," and it then "consciously or deliberately chooses to disregard the harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  Notice can be established by either proving the (1) existence of a pattern of tortious conduct, or (2) by showing the violation of constitutional rights is a "highly predictable or plainly obvious consequence of a municipality's action or inaction . . . thus presenting an obvious potential for constitutional violations." *Id.* at 1307–08.  Deliberate indifference requires a showing of more than just mere negligence.  Rather, it is more equivalent to a recklessness standard. *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

The evidence in the record here does not show that the JCSO was deliberately indifferent in its failure to include specific instructions regarding the seizure of children pursuant to a PFA in its official policies.  There is an abundance of deposition testimony from various JCSO employees that shows this specific scenario was very unique, and that JCSO deputies in the Patrol Division rarely deal with out-of-

county PFAs and PFAs that include child custody orders. It was not plainly obvious that these broad policies regarding PFAs and civil service should have included specific guidance regarding how to handle child custody orders within PFAs; and, that without this guidance, JCSO deputies would inevitably commit a constitutional rights violation. The court finds that there is not sufficient evidence in the record to support this theory, and therefore grants defendants' motion as to whether a formal JCSO policy was the cause of plaintiff's constitutional injury.

### b. Informal Custom or Practice

The Supreme Court has "long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Praprotnik*, 485 U.S. at 127. First recognized in *Adickes v. S.H. Kress & Co.*, the court reasoned that "settled state practice . . . can establish what is state law," and "[d]eeply embedded traditional ways of carrying out state policy . . . are often tougher and truer law than the dead words of the written text." 398 U.S. 144, 167–68 (1970).

One alleged unconstitutional act does not amount to a "custom"; rather, "[t]here must be a 'persistent and widespread practice.'" *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002). And even if a plaintiff can show evidence of a persistent and widespread practice, there still must be evidence that the policymaking official of the municipality had actual or constructive knowledge. *Id.* at 330.

"The existence or nonexistence of an informal policy, practice, or custom is a question of fact for the jury . . . ." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1212–13 (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 599 (6th Cir. 2007) ("[T]he evidence showed at least a disputed question of fact as to the existence of its alleged policy or custom. . . ."); *Surprenant v. Rivas*,

424 F.3d 5, 21 (1st Cir. 2005) ("O'Mara challenges the very existence of the interdicted policy, custom, or practice. Proving the existence of a policy, custom, or practice normally entails questions of fact." (citation omitted)); *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) ("In order to avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation."); *Gregory v. City of Rogers, Ark.*, 921 F.2d 750, 757 (8th Cir. 1990) ("[A]ppellants have raised material questions of fact whether it was the custom of the Rogers Police Department that officers could use their discretion in deciding whether or not to arrest intoxicated individuals, despite the state statute requiring their arrest."); *Fancher v. Barrientos*, No. CIV 11–0118 LH/LAM, 2013 WL 8600085, at *4 (D.N.M. Aug. 19, 2013) ("[A]t this time the record is unclear and it remain a question of fact as to which policy was in place."); *Jacobs v. Dujmovic*, 752 F. Supp. 1516, 1525 (D. Colo. 1990) ("[T]he Jacobs have failed to meet their summary judgment burden of showing that it adopted a policy, custom or procedure that caused constitutional violations, or that there is a question of fact as to the existence of such a policy.")).

Proving an informal, unwritten policy requires evidence such as "a pattern of multiple similar instances of misconduct," or "police officers' statements attesting to the policy's existence." *Id*. at 1213.

Plaintiff alleges that the JCSO developed informal customs and practices regarding the service of PFA orders and the facilitation of any custody exchanges ordered within the PFA order. Plaintiff claims that the evidence shows that the JCSO practice was that PFA orders authorized deputies to physically remove a child from a PFA defendant's custody if necessary, and that because PFA orders are immediately enforceable when signed by a judge, deputies did not have to serve the PFA defendant with a copy of the order before they could seize or otherwise force the transfer of custody of a child. Plaintiff argues this informal policy caused the violation of her Fourth Amendment rights.

i.    Existence of an Informal Policy

In his deposition, Capt. Rokusek testified as to the types of policies used by the JCSO. He testified that sometimes practices and customs are developed over time and they aren't necessarily written down. (Doc. 105-3 *SEALED*, at 14.)

Plaintiff submitted excerpts from six depositions of JCSO employees involved in this incident. In several of these depositions, officials testified that PFA orders are enforceable when signed by a judge, and therefore the orders within the PFA order—such as child custody orders—are enforceable even before the PFA defendant is served with the PFA order. *See, e.g.*, Deposition of Mark Rokusek, (Doc. 105-3 *SEALED*, at 18) ("Q: . . . Is it your understanding that the child custody orders are immediately enforceable as soon as the judge signs that order? A: Yes. Q: Do they need to be served on the opposing party before those custody orders are enforceable? A: The language is immediately enforceable."); Deposition of Mark Rokusek, (Doc. 105-3 *SEALED*, at 21) ("Q: And it's your understanding, then, something being a child custody order means that it's immediately enforceable by law enforcement? A: Yes, that's the language of the order and, specifically, the sheriff as we are by statute required."); Deposition of Sergeant Christopher Mills, (Doc. 105-1 *SEALED*, at 28) ("A: . . . Now, they're enforceable, the orders, but they're not arrestable unless someone has been served. You can't arrest someone for a violation of it if they haven't been served, but you can enforce these is how I've always been trained . . . Q: And you had also discussed the distinction between arrestable versus enforceable quite a bit. And just to be clear, one of the ways you understood PFA orders and the child custody provisions under those orders to be enforceable was to physically remove the child from where they were and deliver them to the parent, correct? A: Correct."); Deposition of Sergeant Brian Deer, (Doc. 23, at 23) ("Q: . . . What I'm asking is when is it appropriate to physically grab a child in this situation?" A: When you're enforcing the order of the court. Q: To your mind, that enforcement, the fact that it hadn't been served on Maggie McCormick yet, that was immaterial at this point? A: I believe

they were there to enforce the order that—the temporary orders that were put in by the court. If you're asking me when is it feasible to take a child to another parent, when they're trying to enforce the order in the court."); Deposition of Sergeant Brian Deer, (Doc. 23, at 30) ("Q: Your opinion, I think, correct me if I'm wrong, but based on your testimony today the protective order itself is enforceable whether it's been served or not, correct? A: "Yes.""); Deposition of Mike Pfannenstiel, (Doc. 105-5 *SEALED*, at 27) ("So do I understand that you mean that you cannot, per this policy, you would not arrest someone for violation of a protective order had they not been served prior, you know, prior to that opportunity to arrest them? A: That's correct. Q: But it doesn't imply that the order and the order is, you know, present in the protective orders are unenforceable until they are served?" A: That's correct.").

Defendants do not controvert that deputies believe that a PFA order is "enforceable" as soon as it is signed by a judge and that a PFA order authorizes the JCSO to physically remove a child from the PFA defendant's custody if necessary. (Doc. 109, at 8.)

Defendants do argue, however, that there is no evidence that this was an official custom or practice because there is no evidence that any deputy had encountered a similar situation. Without evidence that deputies had acted similarly in the past, plaintiff cannot prove this is a informal custom or practice.

The court disagrees. There is testimony from four separate JCSO officials that PFA orders are enforceable, not arrestable, when signed by the judge—meaning deputies may enforce the order without serving the PFA defendant. Simply because deputies had not encountered this precise scenario in the past does not mean that an informal policy did not exist. The fact that at least four different officials corroborated this sentiment is enough that a jury could find an informal policy within the JCSO existed—especially considering Capt. Rokusek's testimony that sometimes practices and customs are developed over time, but aren't necessarily written down.

The court finds there is evidence in the record in which a jury could find that the JCSO had an informal policy that PFA orders were enforceable when signed by the judge—including child custody orders—even without prior notice to the PFA defendant.[2]

ii.     Whether the Policy Caused the Constitutional Violation

Even with evidence in the record that supports the existence of a certain policy, plaintiff may only survive summary judgment if she can show there is evidence that this policy was the moving force behind her alleged constitutional injuries.

At the outset, the court notes that it stands by its finding that it is clearly established law that children enjoy Fourth Amendment protections against unreasonable seizures, and that they cannot be removed from their parents' custody—absent exigent circumstances or a warrant—without first giving the parents notice and a hearing.  (Doc. 40, at 14.)   And the court stands by its earlier ruling that when considering this clearly established law, there is evidence in which a jury could find defendants—in their individual capacities—acted unreasonably during the September 2, 2015 incident, thus precluding qualified immunity.

However, deciding whether a policy or custom of the JCSO (and not just the acts of individuals) was the moving force behind plaintiff's constitutional injury requires a more in-depth interpretation of what seems to be unclear guidance from the Kansas Protection from Abuse Act ("KPAA").

The KPAA authorizes a court to enter temporary child custody orders prior to a hearing on the PFA petition.  *See* K.S.A. § 60-3106(b).  Under the statute, "[n]o temporary order shall have the effect of modifying an existing order granting legal custody, residency, visitation or parenting time unless there

---

[2] Defendant also argues that even if plaintiff has made a sufficient evidentiary showing that a policy exists, plaintiff's argument still fails because the alleged practice is constitutional.  The court, however, does not believe a policy must be facially unconstitutional to be actionable.  Whether the policy itself is facially unconstitutional is not an element of a *Monell* claim.  Rather, *Monell* requires the plaintiff to show that the policy was the moving force behind her constitutional violation.  *See*, *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (noting, "[c]ity policy 'need only cause [the] constitutional violation; it need not be unconstitutional per se.).

is sworn testimony at a hearing to support a showing of good cause." *Id.* Beyond these provisions, the KPAA is silent on any procedural aspects of the custody transfer. There is no mention on how custody is to be transferred once a court has entered a temporary order.

The PFA order at issue here, which Ryan obtained against Maggie, and not S.F.M., included a provision that stated that temporary legal custody of S.F.M. "shall be: [s]ole legal custody granted to plaintiff." (Doc. 100-1 *SEALED*, at 14.) The order did not include any instructions for how the custody order should be enforced or if deputies had the authority to physically remove S.F.M. from Maggie's custody. The PFA order did state, under a "Warnings to Defendant" section, that "[t]his order is effective when signed by the judge. Law enforcement officials shall immediately enforce this order." (Doc. 105 *SEALED*, at 6.)

There is evidence in the record that shows the JCSO has an informal policy that PFA orders are enforceable, not arrestable, immediately after they are signed by a judge—and deputies do not need to serve the PFA defendant before enforcing the order. This includes child custody orders within the PFA. Several JCSO officials testified that so long as a child is outside of the home, a PFA custody order authorizes JCSO deputies to facilitate the custody transfer, even if that requires physically removing the child and delivering them to the parent who has lawful custody. So, according to testimony from JCSO officials, JCSO deputies could—pursuant to a PFA order—facilitate the child custody transfer included in the order without first serving the PFA defendant, so long as the child at issue was outside of the home.

And in the present case, the JCSO followed that policy. JCSO deputies arrived at Baker's home to serve the PFA on Maggie. The deputies knew that the order contained a transfer of custody of a young child. When confronted by Baker, who was uncooperative, Sgt. Mills announced that they had a PFA and they were there to take S.F.M. Without attempting to serve the PFA on Maggie, Sgt. Mills decided

to "enforce" the custody provision of the order, which resulted in him picking up plaintiff—the wrong child—and carrying her down the driveway.

The court recognizes potentially two ways this informal policy could have been the moving force behind plaintiff's constitutional injury. First, plaintiff's Fourth Amendment rights were violated as a result of Sgt. Mills's act of seizing her pursuant to the JCSO policy that deputies could "enforce" the PFA order without serving the PFA defendant—in this case, her mother.

Again, as the court mentioned in its prior order, it is clearly established that officers do not have the authority to remove a child from custody without a hearing and *notice* to the parent, unless they have an ex parte order to remove the child or the child is in imminent danger. *See Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006) (finding state officials may not remove children from the home, even through a temporary seizure, without due process of law, which requires that parents "receive prior notice and a hearing" unless emergency circumstances exist which pose "an immediate threat to the safety of a child."). In *Hollingsworth*, the Tenth Circuit found that a protection order, issued pursuant to the Oklahoma Protection from Domestic Abuse Act that covered the PFA defendant's children, did not "justify the removal of [her] children without prior notice and a hearing." 110 F.3d at 739.

The notice requirement is intended to protect parents' Fourteenth Amendment rights to familial association and privacy which "cannot be violated without adequate pre-deprivation procedures." *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999). And while these rules apply often in scenarios when the state seeks to take custody of children in cases of suspected abuse or neglect, when considering the facts of the present case it is clear why parental notice is so fundamental and necessary. Here, a jury could find that the alleged JCSO policy that deputies may enforce a child custody order in a PFA without serving the PFA defendant, was the moving force behind plaintiff's constitutional injury. This policy, which ignores the clearly established notice requirement, allowed

deputies to seize a child—the wrong child nonetheless—out of a driveway, without first giving the parent notice of the order. Had JCSO deputies first given notice to Maggie before "enforcing" the custody order, Maggie could have, at least, had the opportunity to identify which child was S.F.M., thus avoiding plaintiff's illegal seizure. In a perfect world, deputies would have served the PFA on Maggie, giving her a chance to comply with and assist in the custody transfer, preventing a traumatic experience for a small child and any chance of a constitutional violation. The court recognizes that some scenarios require quick action by government actors in order to protect a child from danger. But there were no facts present in this case that indicated any of Maggie's children were in immediate danger of harm that would justify removing them without providing notice. The judge issuing the PFA did not make any findings that the JCSO needed to quickly remove S.F.M. from his mother's custody, and nothing in the KPAA indicates that a temporary custody order should be enforceable without regard to the clearly established notice requirement.

Further, many JCSO officials testified that so long as a child was outside of the home, they had the authority to facilitate the custody exchange without serving the PFA on the defendant. Hypothetically, had Baker not been outside with plaintiff at the time the JCSO defendants arrived at the home, their policy would have allowed them to take plaintiff—or any child they reasonably thought was at issue in the PFA—without giving notice to any adult at the home. Without notice or service of the PFA, the custodial parent is left without knowing where her child is or who her child is with, and creates, as we have seen here, a potential scenario in which the wrong child is seized. This is especially problematic considering, even with a temporary interference in custody, that "once physical custody is erroneously transferred, it may never be regained." *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 650 (7th Cir. 2003).

A jury, therefore, could find that a policy that does not require service of the PFA before enforcing child custody orders, was the moving force behind plaintiff's constitutional injury. Giving notice to Maggie could have prevented the unconstitutional seizure of plaintiff, who was not the child at issue in the PFA custody order.

Second, the policy authorizes deputies to enforce the custody order—sometimes by physically removing a child—without a warrant or exigent circumstances. Again, it is clearly established that a child may not be seized absent a warrant or exigent circumstances, and a policy that allows for a warrantless seizure could easily be considered by a jury as the moving force behind the violation of plaintiff's Fourth Amendment rights.

There is some discussion by defendants that the PFA itself satisfies the "warrant" requirement. A warrant is defined as "a writ directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest, a search, or a seizure." WARRANT, Black's Law Dictionary (10th ed. 2014).

Deciding whether the custody order at issue was a warrant requires an examination of the KPAA. Kansas law is silent on the nature of the temporary custody order provided by the KPAA, and the KPAA provides no guidance as to how child custody orders should be "enforced." Under Kansas law, there are several statutory provisions that provide clear instruction for how and when a child may be taken into state custody. Under the Kansas Code for Care of Children, a judge may issue an ex parte order directing authorities to take a child into state custody. *See* Kan. Stat. Ann. § 38-2242(a). And under the Kansas Juvenile Justice Code, a law enforcement officer may only take a juvenile into custody if the officer has a warrant to take the juvenile into custody or has probable cause to believe the juvenile is committing an offense or has committed an offense. *See* Kan. Stat. Ann. § 38-2330(a).

Kansas law also provides guidance on how and when a court may enter child custody orders and how to modify those orders. *See* Kan. Stat. Ann. § 23-3201 *et seq*. Importantly, Kan. Stat. Ann. § 23-

2401 provides procedures for "enhanc[ing] the enforcement of court ordered child visitation rights and parenting time by establishing a simplified, expedited procedure to provide justice without necessitating the assistance of legal counsel." Under this provision, a party "who has been granted visitation rights or parenting time may file with the court a motion alleging denial or interference with those rights and enforcement of those rights." Kan. Stat. Ann. § 23-2401(b). These procedures are in addition to enforcement procedures provided in the UCCJEA. *Id.* Nothing in these custody enforcement procedures authorizes law enforcement officers to facilitate the transfer of custody, pursuant to a court-ordered custody arrangement, by physically seizing or removing a child. In fact, the UCCJEA requires a party to seek a warrant to take physical custody of a child if a party believes the child is "immediately likely to suffer serious physical harm or be removed from this state." *See* Kan. Stat. Ann. § 23-37,311(a).

The question becomes whether the KPAA custody order is more analogous to a child in need of care situation, in which the ex parte order would be considered a warrant to physically remove the child, or whether it is more similar to a custody order enforceable under the provisions of Kan. Stat. Ann. § 23-2401, which do not include a removal provision.

The court believes that a temporary custody order within a PFA, particularly when the PFA does not cover the children at issue, is not analogous to a child in need of care situation. The Kansas Code for Care of Children provides detailed guidance for handling the very sensitive issues of potential child abuse and neglect, including provisions that specify when children may be removed from their parents' custody. When, like here, there are no findings of fact to indicate that children are in danger or express language ordering removal, it is unlikely that a court order transferring custody—and nothing more— would be considered a warrant that would justify physical removal of children by law enforcement.

This conclusion is supported by the Tenth Circuit, which found that a PFA defendant's procedural due process rights were violated when a deputy removed her children from her custody

pursuant to an order issued pursuant to the Oklahoma Protection from Domestic Abuse Act. *Hollingsworth*, 110 F.3d at 739. Importantly, even though the children were the subject of the protection order, the order contained no instructions to physically remove the children from their mother's custody, and nothing in the Oklahoma law justified the removal of the children without prior notice and a hearing.[3] *Id.* Similarly here, there were no instructions in the PFA order to physically remove S.F.M., and nothing in the KPAA mentions physical removal of a child pursuant to a temporary custody order. Considering, for example, the Kansas Code for Care of Children, it seems clear that affirmative, written instructions to physically remove a child, even temporarily, are required before law enforcement may do so, absent exigent circumstances. Explicit instructions are necessary because "seizures, especially seizures of young children, should not be undertaken lightly." *Dunn*, 347 F.3d at 649.

The court does acknowledge that a PFA situation is different from a standard child custody order. The mere fact a PFA has been issued indicates there is likely a heightened risk of volatility between the parties. Officers may have to act quickly as the situation develops. But this *potential* for volatility does not excuse the fundamental due process requirement that parents are entitled to notice before their parental rights are transferred. And it does not override a child's Fourth Amendment protection against seizure absent a warrant or exigent circumstances.

The court, therefore, finds the temporary custody order within the PFA was not a warrant that justified physical removal of a child, and rejects defendants' argument that their policy to enforce the custody order within the PFA by physically seizing the child was not the moving force behind plaintiff's constitutional injury because they were acting pursuant to a warrant.

The court declines to dictate an appropriate rule or procedure should a PFA defendant refuse to transfer custody of a child once they have been served with the PFA and are aware custody has been

---

[3] The Tenth Circuit granted the deputy qualified immunity because his actions were reasonable in light of instructions he received from an Assistant District Attorney.

temporarily transferred. There are protections in place under the KPAA for PFA defendants who violate the terms of the PFA order. *See* Kan. Stat. Ann. § 60-3107(h); § 60-3110. There could be a situation in which a PFA defendant becomes uncooperative, and it may be reasonable for an officer to take quick action. In some situations, it may be more appropriate to have a court find the PFA defendant in contempt of court. But this court does not sanction a "policy" in which a child is removed from a parent's custody without a warrant or exigent circumstances and without first giving the parent notice and an opportunity to comply and peacefully transfer custody of the child.

For these reasons, the court finds there is evidence in the record in which a jury could find this informal policy of the JCSO was the moving force behind plaintiff's constitutional injury. Defendants' motion is denied on this theory.

c. *Final Policymaker Decision*

The Supreme Court has held that "an unconstitutional policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business," thus giving rise to municipal liability. *Praprotnik*, 485 U.S. at 123; *see also*, *Pembaur*, 475 U.S. at 481 (finding "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."). Not every decision by a municipal officer automatically subjects the municipality to liability. Liability only attaches "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered," and where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 481–483.

Plaintiff alleges that division commanders in the JCSO—who are final policymakers with respect to directives—made continual decisions not to update constitutionally inadequate policies related to PFA services and the removal of children, despite knowing that warrants or exigent circumstances were required before they could remove children from their parents' custody. The decision to not update policies, according to plaintiff, led to the violation of her constitutional rights.

Again, plaintiff seems to allege that defendants' failure to act caused her constitutional injury, and a failure to act requires a showing of deliberate indifference. There is no evidence in the record that anyone in the JCSO, whether it was the sheriff or division commanders, made a deliberate choice to not update policies or that this failure to act was deliberately indifferent to plaintiff's constitutional rights. And this alleged failure to update policies is unlikely the type of "decision" by a final policymaker that the Supreme Court envisioned would implicate *Monell* liability. For these reasons, the court grants defendants' motion as to whether a decision by a final policymaker led to the violation of plaintiff's constitutional rights.

### d. Ratification by a Final Policymaker

According to the Supreme Court, if a subordinate municipal official's decision is subject to review by the municipality's final policymaker, the final policymaker has "retained the authority to measure the official's conduct for conformance with *their* policies." *Praprotnik*, 485 U.S. at 127. Therefore, if the final policymaker "approve[s] a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id*. Essentially, the final policymaker's approval of a subordinate's decision is the equivalent of the final policymaker making that decision. And if that decision, much like final policymaker decision liability discussed above, was made deliberately from among various alternatives, that decision can be considered a municipal policy that gives rise to *Monell* liability.

Under this ratification theory, plaintiff alleges that Capt. Rokusek's disciplinary decisions after the incident are evidence that the JCSO approves of an unconstitutional policy that ultimately led to the violation of her Fourth Amendment rights. Plaintiff claims that Capt. Rokusek merely issued written reprimands to Lt. Reddin and Sgt. Mills instead of addressing the underlying policies that led to the incident, which, according to plaintiff, serves as an endorsement of the unconstitutional policy. Plaintiff however, has not alleged that Capt. Rokusek is a final policymaker for the JCSO, only for the investigation into Terri Baker's complaint. While this "ratification" theory may be evidence of the existence of an informal policy, it is not alone enough to be considered an "official policy" giving rise to *Monell* liability. Defendants' motion is granted on the ratification theory.

### e. Failure to Train/Supervise[4]

As mentioned above, the Supreme Court has held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387. It is only when a municipality's failure to train employees evidences a "'deliberate indifference' to the rights of its inhabitants" can this failure to train be considered "a city policy or custom that is actionable under § 1983." *Canton*, 489 U.S. at 389.

The failure to train theory, first recognized by the Supreme Court in *Canton*, requires a "high degree of fault on the part of city officials," in order to be consistent with *Monell*. *Canton*, 489 U.S. at 396 (Brennan, J., concurring). To impose a lesser standard of fault "would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*. . . ." *Id*. at 392. By using language like "deliberate indifference," "substantially certain," and "deliberate choice," the Supreme Court reiterated this high degree of fault burden and conveyed its intent that failure to train claims should be actionable under § 1983 in only limited circumstances. These limited circumstances could be shown in

---

[4] Plaintiff concedes that her failure to supervise claim against Lt. Reddin is against Lt. Reddin in his individual capacity, not official capacity. Any official capacity claims against Lt. Reddin are therefore dismissed.

instances where a "municipality [] fail[s] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face," or "where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations . . . ." *Id.* at 396–97 (Brennan, J., concurring).

A plaintiff claiming inadequate training under § 1983 must show a specific training deficiency that, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifference to the need." *Canton*, 489 U.S. at 390. Again, deliberate indifference requires a showing that the municipality has "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation," and a conscious or deliberate choice to disregard the harm. *Barney*, 143 F.3d at 1307. Notice can be established by either proving the (1) existence of a pattern of tortious conduct, or (2) by showing the violation of constitutional rights is a "highly predictable or plainly obvious consequence of a municipality's action or inaction . . . ." *Id*. at 1307–08. It is not sufficient to simply show that an injury or accident could have been avoided if an officer had better training or that a training program had occasionally been negligently administered. *Id.* at 391.

Plaintiff argues that the JCSO's failure to train demonstrates a deliberate indifference to the constitutional rights of the citizens of Johnson County, including plaintiff. Specifically, plaintiff claims that the JCSO never provided adequate training or supervision to the deputies charged with serving PFA orders, specifically PFA orders that include child custody determinations, and this failure to train or supervise led to the violation of her constitutional rights. Lt. Reddin, Sgt. Mills, and Deputy Turner all testified they had not received specific training regarding child custody orders within PFAs. Plaintiff claims there is evidence in the record that shows both a pattern of similar tortious conduct by JCSO

deputies and that the risk of constitutional harm was, or should have been, plainly obvious and highly predictable.

The court has reviewed the evidence in the record and the arguments of both parties, but does not find that plaintiff has shown that a failure to train by the JCSO amounts to deliberate indifference to the constitutional rights of plaintiff and the citizens the JCSO serves. Defendants testified in depositions that they had not been specifically trained on serving PFAs with child custody orders, but defendants also testified that circumstances such as the one involved in this case were extremely rare. And plaintiff has not shown any evidence that service of these types of orders (PFA orders that include a child custody order) was a reoccurring situation or that deputies had even encountered such situations before. There is evidence that shows deputies were trained on the service of civil orders and PFAs, and while the specific element of service of PFAs involving custody orders might have been missing from the training, it is not enough to merely show that an injury could have been avoided if there had been better training.

Again, the Supreme Court has instructed that municipalities should be held liable for failure to train only in limited circumstances. Plaintiff is required to show that the JCSO had actual or constructive notice that a failure to train in this scenario was substantially certain to result in the violation of the constitutional rights of their citizens. The court finds that showing was not made. The court grants defendants' motion on the failure to train and/or supervise theory.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment for *Monell* Claim (Doc. 96) is granted in part and denied in part. Defendants' motion is granted on the formal written policy, final policymaker decision, ratification, and failure to train theories. Defendants' motion is denied on the informal policy theory.

**IT IS FURTHER ORDERED** that individual capacity claims against defendant Sheriff Frank Denning and official capacity claims against defendant Thomas Reddin are dismissed. The clerk is ordered to substitute Sheriff Calvin Hayden in his official capacity for Sheriff Denning.

Dated March 21, 2019, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**
