## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

C.F.B., a minor, by and through her next friend
TERRI E. BAKER,

        Plaintiff,

        v.

SHERIFF CALVIN HAYDEN, et al.,

        Defendants.

Case No. 16-2645-CM

## MEMORANDUM & ORDER

Plaintiff C.F.B., a minor, by and through her grandmother and next friend, Terri E. Baker, brings this action against Johnson County Sheriff Calvin Hayden, Lieutenant Thomas Reddin, Sergeant Christopher Mills, and Deputy Travis Turner. Plaintiff claims that defendants deprived her of her civil rights under 42 U.S.C. § 1983 when members of the Johnson County Sheriff's Office illegally seized her from her grandfather's driveway. The matter is now before the court on defendants' Motion to Exclude or Limit Plaintiff's Expert Witness and Report (Doc. 112). Defendants seek to exclude the testimony and report of plaintiff's expert, Adrienne Dreher Benson, under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). For the reasons set forth below, the court denies defendants' motion.

### I.    Background

On September 2, 2015, defendants Deputy Travis Turner, Sergeant Christopher Mills, and Lieutenant Thomas Reddin arrived at the home of Linus and Terri Baker to serve a temporary Protection from Abuse Order ("PFA") on the Baker's daughter, Maggie McCormick. A judge in Wyandotte County, Kansas granted Maggie's estranged husband, Ryan McCormick, a temporary PFA against Maggie. Within the order, the judge granted Ryan temporary sole custody of the couple's child, S.F.M.

As defendants arrived at the Baker's home, they encountered Linus Baker in the driveway with plaintiff, who is his granddaughter and Maggie's other child with another man. Neither Maggie nor S.F.M. were outside. Defendants informed Linus Baker they had a PFA and that they needed to speak with Maggie. When Linus told them to leave, Sgt. Mills responded, "we're not doing that, I've got a court order, we're here to take [S.F.M.] . . . I've got a court order, she's going with us."

Baker continued to demand that the officers leave, and Sgt. Mills insisted that he had "a protection from abuse order granting sole custody to the plaintiff." Baker began to retreat up the driveway and Sgt. Mills followed him and approached plaintiff, who was standing nearby. Sgt. Mills asked plaintiff, "are you [S.F.M.]? Come here sweetheart." As Sgt. Mills reached down to pick up plaintiff, Baker began yelling "that is not [S.F.M.]!" Plaintiff began to cry and scream for her mother as soon as Sgt. Mills picked her up. Baker continued to yell at Sgt. Mills to "give me that baby, give me [C.F.B.]." Sgt. Mills proceeded to carry plaintiff down the driveway noting he was going to "check with the parents" presumably about the identity of the child. Sgt. Mills carried plaintiff off the driveway and took her to a van where Ryan was parked with his mother. Sgt. Mills asked Ryan if plaintiff was S.F.M. to which Ryan responded "no, [S.F.M.] is a boy." Sgt. Mills then carried plaintiff back up the driveway. Baker grabbed plaintiff out of his arms and carried her up the driveway, continuing to demand that the officers get off his property.

Plaintiff filed the present suit against defendants for violating her Fourth Amendment right against unreasonable seizures. As part of the litigation, plaintiff was evaluated by Adrienne Dreher Benson, a Licensed Professional Counselor. Benson earned her master's degree in licensed counseling at the Denver Seminary in 2006. She held a license in Colorado—although there is some confusion as to what license she held. Defendants allege that after graduating with her master's degree, she was a licensed Registered Psychotherapist in Colorado from March 2006 to June 2007. Between 2006 and

2010, Benson worked sporadically, occasionally doing contract work for schools while she stayed at home with her children. At some point after 2006, she relocated to Kansas City. She allowed her Colorado license to lapse while she pursued her Missouri license, which she received in 2012. In order to get licensed in Missouri, Benson did postgraduate work at Rockhurst and completed 2,000 supervised hours.

For about six months between 2014-2015, Benson was hired by the Pembroke School to work with a second-grade student who had suffered from sexual-abuse related trauma. She has some experience evaluating children for Post-Traumatic Stress Disorder ("PTSD"). Benson also formed a private counseling practice in which she sees approximately 10-15 clients per week. She has testified in child custody cases and has worked as a therapist with young children since 2006.

Benson met with plaintiff twice for approximately 45 minutes each time. She also interviewed Linus and Terri Baker, reviewed the video of the September 2, 2015 incident, and reviewed plaintiff's educational and medical records. Based on her evaluation, Benson concluded that plaintiff shows signs of PTSD related to the September 2, 2015 incident.

Defendants now move to exclude or limit Benson's testimony, arguing she is not qualified to render an expert opinion concerning any diagnosis pertaining to plaintiff's trauma, and because she did not reliably apply the principles and methods generally accepted for the evaluation and diagnosis of PTSD.

## II.     Standard

Federal Rule of Evidence 702 determines the admissibility of expert testimony. *Daubert*, 509 U.S. at 588 (1993). Federal Rule of Evidence 702 states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2)

the testimony is the product of reliable principles and methods, and (3) the witness has
applied the principles and methods reliably to the facts of the case.

This rule reflects the court's gatekeeping function, which requires the court to determine whether

expert testimony will assist the trier of fact. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The proponent of expert testimony bears the burden of showing that the testimony is admissible.

*United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). However, the rejection of expert

testimony is the exception rather than the rule. Fed. R. Evid. 702 advisory committee's note.

When determining whether to exclude an expert witness, a two-part test should be applied.

*Nacchio*, 555 F.3d at 1241. First, the expert must be qualified "by knowledge, skill, experience,

training, or education." *Id.* Second, the proposed expert testimony must be reliable and relevant. *Id.*

## III. Analysis

Defendants argue that plaintiff's expert witness should be excluded because she fails both prongs

of the *Nacchio* test. First, defendants claim Benson lacks the requisite skill, experience, training, and

education to render an expert opinion on any diagnosis concerning plaintiff's emotional trauma. Second,

defendants argue that Benson's testimony is not reliable because she did not reliably apply the principles

and methods generally accepted for the evaluation and diagnosis of PTSD.

### a. *Skill, Experience, Training, and Education*

Defendants first take issue with Benson's credentials, arguing that as a Licensed Professional

Counselor—licensed in Missouri—she is unqualified to render any opinions about mental health

diagnoses.

Defendants cite *Johnson v. State*, 58 S.W. 3d 496, 499 (Mo. 2001) as support for their argument.

In *Johnson*, the Missouri Supreme Court found that "[p]ersons who are licensed medical doctors

practicing psychiatry, licensed psychologists, and licensed social workers are permitted by law to

evaluate persons and make diagnoses of mental disorders." *Id.* The court noted that, for example,

clinical social work was defined by Missouri law to include the "diagnosis, treatment, prevention and amelioration of mental and emotional conditions," but the statutory definition of professional counseling did not include "'diagnoses of any sort.'" *Id.* The associate psychologist for the department of corrections—who was in the process of becoming a licensed professional counselor—therefore was not qualified to offer an expert opinion on the defendant's diagnosis. *Id.* (noting "[t]he 'diagnoses' Hoeflein was permitted to make while working at the department of corrections had to be approved and presumably reviewed by a supervising licensed psychologist; thus, Hoeflein should not have been permitted to testify to his 'diagnoses' as 'an expert' at trial.").

It is true that, unlike § 337.600 RSMo, which defines clinical social work as the "application of social work theory . . . . to families and groups in assessment, *diagnosis*, treatment, prevention and amelioration of mental and emotional conditions," the definition of professional counseling under § 337.500 RSMo does not include any references to diagnoses. *Compare* § 337.600(2) RSMo (emphasis added), *with* § 337.500(6) RSMo. Instead, professional counseling includes:

> (a) The use of verbal or nonverbal counseling or both techniques, methods, or procedures based on principles for assessing, understanding, or influencing behavior (such as principles of learning, conditioning, perception, motivation, thinking, emotions, or social systems);
> (b) Appraisal or assessment, which means selecting, administering, scoring, or interpreting instruments designed to assess a person's or group's aptitudes, intelligence, attitudes, abilities, achievement, interests, and personal characteristics;
> (c) The use of referral or placement techniques or both which serve to further the goals of counseling;
> (d) Therapeutic vocational or personal or both rehabilitation in relation to coping with or adapting to physical disability, emotional disability, or intellectual disability or any combination of the three;
> (e) Designing, conducting, and interpreting research;
> (f) The use of group methods or techniques to promote the goals of counseling;
> (g) The use of informational and community resources for career, personal, or social development;

§ 337.500(7)(a)-(g) RSMo. However, as of August 28, 2007, a professional counselor in Missouri must have a minimum of three hours of graduate level coursework in diagnostic systems before they can

become licensed. § 337.510(3) RSMo. Regulations governing the licensure of professional counselors also require each applicant to have no less than one course in diagnosis, which is described as:

> Courses acceptable for this area provide an understanding and a working knowledge of psychodiagnostics using classification systems with an emphasis on the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM). Course content regarding the DSM must include understanding the organizational structure, professional terminology used in the manual, and competence in its application as it is used in the assessment process and subsequent treatment planning . . . .

20 CSR 2095-2.010(4)(J).

Here, Benson received her Missouri license in 2012. She therefore would have been required to take at least one class on diagnosis that would have included instruction on using and understanding the DSM. Defendants also concede Benson had been a licensed psychotherapist in Colorado. Under Colorado law, a registered psychotherapist is a person whose primary practice is psychotherapy, and psychotherapy is defined as:

> the treatment, *diagnosis*, testing, assessment, or counseling in a professional relationship to assist individuals or groups to alleviate behavioral and mental health disorders, understand unconscious or conscious motivation, resolve emotional, relationship, or attitudinal conflicts, or modify behaviors that interfere with effective emotional, social, or intellectual functioning.

C.R.S. § 12-43-201(9)-(9.1) (emphasis added). Benson, therefore, had been previously licensed to provide diagnostic services. Benson also testified that her experience as a counselor since 2006 has helped her to recognize whether a child has been traumatized by an event, and that she had worked "several times" with parents to help evaluate children for PTSD.

Because exclusion is the "exception rather than the rule," the court finds the plaintiff has made the necessary showing that Benson is qualified to render an expert opinion on plaintiff's emotional trauma. The evidence shows that Benson has worked as a therapist for children since 2006, has worked with children with trauma and PTSD, and has licenses and required coursework that cover diagnosing and assessment. This shows that Benson has familiarity and experience with children, with using the

DSM, and with the signs of PTSD. Although the Missouri Supreme Court has found that Licensed Professional Counselors are not qualified to render opinions on mental health diagnoses, those cases were decided before Missouri law changed requiring diagnostic coursework as part of the licensure requirements. The court would, however, limit Benson's testimony only to her opinion that plaintiff "shows signs of Post Traumatic Stress Disorder" as discussed in her report, rather than testifying that she was able to affirmatively diagnose plaintiff with PTSD. The court does not believe plaintiff has established that it is within Benson's job description as a Licensed Professional Counselor to offer affirmative diagnoses of mental health disorders.

### b. Reliability of Methods

Defendants also argue that Benson failed to reliably apply the DSM-5 criteria to plaintiff's symptoms and that her opinion is not based on sufficient and complete facts or data.

In her report, Benson observed that plaintiff showed signs of PTSD based on the DSM-5 diagnosis because she experienced nightmares, intrusive thoughts, and acted out the trauma in play.

Defendants take issue with Benson's testimony during her deposition. They argue that she incorrectly described the application of the DSM-5, which demonstrates she has a misunderstanding of the DSM. They also argue that her opinion is not based on sufficient and complete facts and data because she did not seek input from other people in plaintiff's life—besides her grandparents—and she did not consider any events in plaintiff's life before the September 2, 2015 incident.

Courts have found that it is common to find "disagreements over the interpretation of diagnostic data, and even the correct diagnostic procedures" in the mental health profession. *McCarty v. Liberty Mut. Ins. Co.*, No. 15-CV-210-R, 2017 WL 676459, at * 7 (D. Wyo. Feb. 3, 2017) (citing *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001)). In fact, commentators have observed that, "mental health professionals involved in everyday practice may disagree more than half the time even on major

diagnostic categories . . . ." *S.M.*, 262 F.3d at 921 (citing Christopher Slobogin, *Doubts About Daubert*: *Psychiatrict Anecdata as a Case Study,* 57 Wash. & Lee L. Rev. 919, 920 (2000)).  Variances in the DSM's diagnostic criteria, therefore, do not automatically result in an unreliable opinion.  *Id.*

The court believes that questions as to how Benson applied the DSM criteria when evaluating plaintiff are better left to cross-examination at trial.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 994 (10th Cir. 2003).

**IT IS THEREFORE ORDERED** that defendants' Motion to Exclude or Limit Plaintiff's Expert Witness and Report (Doc. 112) is denied.

Dated March 25, 2019, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**